So Ordered.

Dated: June 21, 2024



G. Michael Halfenger
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

| | |
|---|---|
| Greenpoint Asset Management II, LLC, | Case No. 21-25900-gmh |
| Michael G. Hull, | Case No. 21-25901-gmh |
| Jointly Administered Debtors. | Chapter 11 (Jointly Administered Under Case No. 21-25900) |

**OPINION AND ORDER
(1) DENYING GREENPOINT ASSET MANAGEMENT II LLC'S MOTION TO RECONSIDER; (2) DISMISSING GREENPOINT ASSET MANAGEMENT II, LLC'S CASE; AND (3) TERMINATING JOINT ADMINISTRATION**

Erick Hallick moved to dismiss these jointly administered chapter 11 cases filed by Greenpoint Asset Management II, LLC (GAM II) and Michael Hull. ECF No. 411. The United States trustee supported Hallick's motion and moved separately to dismiss Hull's case. ECF Nos. 435 & 495. After weighing the evidence presented at several days of hearings and considering the parties' written and oral arguments, the court entered an order on March 18, 2024, denying the motion as to Hull but ruling that there was

cause under 11 U.S.C. section 1112(b)(4)(A) to dismiss or convert GAM II's case. ECF No. 566. The order required any party in interest who contended that the court should convert GAM II's case to chapter 7, rather than dismiss it, to file a memorandum explaining why conversion was in the best interests of creditors and the estate. *Id.* at 9-11 & 24.

GAM II moved the court to reconsider its March 18 order and, in the alternative, argued in favor of conversion. ECF No. 572. Hallick and the Unites States trustee oppose reconsideration and support dismissal. ECF Nos. 573, 611, 615, & 618.

I

GAM II argues that the court made two errors when it found cause to convert or dismiss GAM II's case. Because the March 18, 2024 order was not a final order, reasons GAM II, the court has discretion to reconsider the ruling to correct the perceived errors. ECF No. 572, at 2 (citing *In re Randell*, 638 B.R. 104, 106 (Bankr. E.D. Wis. 2022)). For purposes of this opinion and order, the court presumes that GAM II is correct about the standard governing reconsideration since the outcome would be the same regardless.

A

An overview of the March 18 ruling is required to put GAM II's challenges to it in context.[1] The ruling concluded that there was cause to dismiss or convert GAM II's case because the moving parties proved the existence of a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation", under 11 U.S.C. section 1112(b)(4)(A). The ruling detailed the evidence supporting that conclusion—most significantly that (1) GAM II operated solely as a managing member of Greenpoint Tactical Income Fund LLC (the Fund); (2) in July 2023 the Fund terminated GAM II as a managing member; (3) GAM II has not received any

---

1. The court's March 18, 2024 ruling provides factual background about GAM II's case and the related bankruptcy case of *In re Greenpoint Tactical Income Fund, LLC*, Case No. 19-29613. See ECF No. 566. This opinion presumes familiarity with it.

significant income since—indeed, it has not received any significant income during the time this case has been pending; and (4) GAM II has incurred administrative expenses of over $800 thousand through the end of 2023.[2]

The ruling also detailed the reasons for the court's conclusion that GAM II lacked a reasonable likelihood of rehabilitation. Rehabilitation is unlikely if the debtor lacks an "ability to restore the viability of its business." *Loop Corp. v. United States Trustee*, 379 F.3d 511, 516 (8th Cir. 2004); see also *Andover Covered Bridge, LLC v. Harrington* (*In re Andover Covered Bridge, LLC*), 553 B.R. 162, 174–75 (B.A.P. 1st Cir. 2016) ("'Rehabilitation' in this context means whether the debtor will be able to reestablish its business".). The ruling concluded that "[t]he plan does not 'reestablish' GAM II's 'business', nor could it reasonably do so, given the Fund's termination of GAM II as its manager and the jury verdict in the SEC action."[3] ECF No. 566, at 9. Indeed, the court found that the evidence did not allow it to "reasonably conclude that GAM II can reestablish its former business as a managing member of [the Fund] or profitably operate some other business." *Id*. The ruling observed that, as a matter of law, a debtor

---

2. The March 18, 2024 order noted that in January 2024 GAM II reported a bank balance of $123.90, "it ended 2023 with a balance of $128.90", and "[i]n November 2023 GAM II used a $300 'member contribution' from H Global LLC, another Hull-controlled entity that owns GAM II, to pay its quarterly fee to the United States trustee." ECF No. 566, at 7 (citing ECF Nos. 500, at 2, 5 & 6; 547, at 2; & 561, at 2). The March 18 order further detailed that "GAM II has incurred more than $273 thousand in unpaid administrative expenses to its chapter 11 counsel" through November 30, 2023, administrative expenses "of $297,600 for 'compensation for [Hull's] services while GAM II was a managing member of [the Fund]'" and of $194,772 "for rent [to Angela Hull] while GAM II was a managing member of [the Fund]", and finally $44 thousand in additional accrued, unpaid expenses in this case through December 2023. See ECF No. 566, at 7–8 (quoting ECF No. 428, at 5) (citing ECF Nos. 428, at 5; 493, at 3; & 547, at 2 & 7).

3. The "SEC action" is a civil action that the SEC is prosecuting in the United States District Court for the Western District of Wisconsin in which the SEC alleged that GAM II, the Fund, the Fund's other manager, and related entities defrauded the Fund's investors. *See SEC v. Bluepoint Inv. Counsel, LLC*, Case No. 19-cv-00809 (W.D. Wis.). On August 2, 2022, a jury empaneled in that action found that all the defendants, including Hull, GAM II, and the Fund, had violated several federal securities laws. *Id*., ECF No. 370. After the verdict the SEC requested that the district court order all defendants to disgorge more than $19 million and order Hull and GAM II to pay substantial civil fines. *Id*., ECF No. 390. That matter remains under advisement by the district court, but the defendants, including GAM II, did not contest the verdict.

that proposes a liquidating chapter 11 plan lacks a reasonable likelihood of rehabilitation; the ruling construed GAM II's proposed chapter 11 plan to essentially be such a plan, finding that "GAM II's portion of the debtors' joint plan effectuates GAM II's liquidation by collecting GAM II's claims against the Fund and liquidating GAM II's stay class equity interests in [the Fund to pay] all liquidation proceeds to creditors and then the remainder to Hull, GAM II's ultimate owner." *Id.* at 9.

B

GAM II contends that there is error in two of the March 18 ruling's conclusions—that (1) GAM II's estate suffered continuing losses and (2) GAM II lacks a reasonable likelihood of rehabilitation. While GAM II's contentions suggest a need for greater explanation about why there is cause to dismiss or convert GAM II's chapter 11 case, they do not warrant a different outcome.

1

In contesting the conclusion that there were continuing losses to GAM II's estate, GAM II focuses on this passage from the March 18 order:

> GAM II has incurred substantial administrative expenses operating as debtor in possession of its bankruptcy estate. Through November 30, 2023, GAM II has incurred more than $273 thousand in unpaid administrative expenses to its chapter 11 counsel, expenses that will necessarily continue to grow if this case continues. ECF No. 493, at 3. In addition, GAM II reports that it owes Hull an administrative expense of $297,600 for "compensation for his services while GAM II was a managing member of [the Fund]" and Angela Hull an administrative expense of $194,772 "for rent while GAM II was a managing member of [the Fund]". ECF No. 428, at 5. GAM II as debtor in possession has also accrued other unpaid expenses: Its December 2023 monthly operating report lists total accrued, unpaid expenses in this case (excluding compensation owed Hull and rent due to his wife) of about $44 thousand. ECF No. 547, at 2 & 7. GAM II's performance as debtor in possession has thus resulted in total administrative expenses of over $800 thousand.
>
> These losses are "continuing" for purposes of section 1112(b)(4)(A)'s definition of "cause" for dismissal because GAM II has no ongoing business operations. As the Eighth Circuit reasoned in *Loop Corp. v. United States Trustee*, "In the context of a debtor who has ceased business operations and

> liquidated virtually all of its assets, any negative cash flow—including that resulting only from administrative expenses—effectively comes straight from the pockets of the creditors. That is enough to . . . find[] continuing loss to or diminution of the estate." 379 F.3d 511, 516 (8th Cir. 2004) (citations omitted).

ECF No. 566, at 7–8. Ignoring the first paragraph entirely, GAM II fires at the second paragraph's conclusion that because GAM II is no longer operating and plans to liquidate assets to pay creditors, "any negative cash flow . . . is enough to . . . find[] continuing loss or diminution of the estate." *Id.* at 8 (quoting *Loop Corp.*, 379 F.3d at 516). GAM II argues that this is an error, contending that it remains an ongoing business because it holds claims against and a passive equity position in the Fund from which it may someday obtain income. GAM II makes this point as follows:

> The Court based its determination that GAM II was sustaining "continuing" losses on a conclusion that "GAM II has no ongoing business operations." In doing so, the Court applied a too-narrow definition of ongoing business operation, and consequently misapprehended GAM II's current circumstances. . . . GAM II's termination as managing member of the Fund should not be seen as causing it to have no ongoing business operations. GAM II continues to pursue its litigation against the Fund to collect the administrative claim owed it. GAM II also continues to hold its stay class equity interests in the Fund, which may yield value in the future for the estate upon the Fund satisfying its obligations under its own plan of reorganization.

ECF No. 572, at 2–3 (footnote omitted) (quoting ECF No. 566, at 8).

There is no misapprehension of GAM II's current circumstances. GAM II's continued existence as a vehicle to pursue collection of claims and distributions from the Fund does not make it an ongoing business in the sense relevant to determining whether GAM II's estate is incurring continuing losses for purposes of section 1112(b)(4)(A). GAM II's potential ability to collect funds by liquidating claims against and receiving equity distributions from the Fund does not change the fact that during

this case GAM II has realizing almost no income. Ongoing business or not, GAM II has incurred administrative expenses during the bankruptcy case, and it will continue to incur such expenses as long as it continues under chapter 11. Thus, as a matter of fact, its losses, for which there has been no meaningful offsetting income, are "continuing" within the meaning of section 1112(b)(4)(A).

But GAM II's request for reconsideration does suggest a need for a more thorough explanation of why the evidence shows that section 1112(b)(4)(A)'s "substantial or continuing loss to or diminution of the estate" element is satisfied. As the March 18 ruling detailed, in the first quoted paragraph above, GAM II's estate has incurred over $800 thousand of administrative expenses. Under the factual circumstances here, those losses are substantial, they have resulted in a diminution of the estate, and the chance that GAM II will obtain revenue or returns in the foreseeable future to offset those losses is no better than speculative.

Returning to whether GAM II should be considered an ongoing business for purposes of determining cause under section 1112(b)(4)(A), GAM II served as a vehicle through which Michael Hull co-managed the Fund. The Fund ended that relationship: It terminated GAM II as a managing member and is now under wholly new management. The evidence shows neither that GAM II has a prospect of restoring its business relationship with the Fund or an ability to engage in some other business. And, though GAM II will continue to hold claims against and equity in the Fund, GAM II's ability to collect from the Fund is suspect. As already noted, those claims and interests have not generated income for GAM II during the pendency of this case, even though the Fund's bankruptcy plan was confirmed two years ago. More important, the Fund is unlikely to pay GAM II anytime soon and perhaps not at all voluntarily. The Fund lacks liquidity and contends that it has claims against GAM II, including for indemnification and breach of fiduciary duty, that it intends to use to offset its payment obligations to GAM II. In addition, under the terms of the Fund's plan and operating agreement, the

Fund cannot make equity distributions to GAM II until after the Fund pays millions of dollars to investors who exercised a withdraw option under its plan of reorganization.

Given all this, GAM II has not shown error in the March ruling's finding that the first prong of section 1112(b)(4)(A)'s cause criterion—"substantial or continuing loss to or diminution of the estate"—is satisfied, even if GAM II's existence continues as a holder of claims and equity interests. *In re California Palms Addiction Recovery Campus, Inc.*, No. 22-40065, 2022 WL 2116643, at *14 (Bankr. N.D. Ohio June 10, 2022) ("Because the purpose of § 1112(b) is to preserve assets by preventing a debtor-in-possession from gambling on continuation of the enterprise at the expense of the estate and its creditors, § 1112(b)(4)(A) provides 'cause' exists for a debtor who has ceased business operations and that continue to accrue administrative expenses without corresponding income."). To the contrary, for the reasons explained in the March 18 ruling and here, the court finds that GAM II's estate has suffered losses that are both substantial and continuing and that there has been a diminution of the estate within the meaning of section 1112(b)(4)(A).

2

GAM II contends that the court also erred when it concluded that GAM II's proposed chapter 11 plan calls for liquidation and thus that GAM II lacks a reasonable likelihood of rehabilitation—the second prong of section 1112(b)(4)(A)'s cause criterion. GAM II argues that its proposed plan is *not necessarily* a liquidation plan:

> GAM II's portion of the Plan does not effectuate a liquidation of GAM II. GAM II's prosecution of its administrative claim against the Fund and eventual distribution of the proceeds represents an eventual liquidation of one significant asset of the estate. However, all of the property of the estate is not necessarily being liquidated. The dissolution of GAM II only occurs if GAM II cannot pay unsecured creditors in full through the proceeds of its administrative claim *and* its future distributions on account of its stay class equity interests. Liquidation is but one of multiple scenarios. In any event, GAM II is also not ceasing its operations, as it will continue two important operations: prosecuting its administrative claim against the

Fund, and holding its stay class equity interests [in the Fund].

ECF No. 572, at 5 (footnote omitted). GAM II argues that the March 18 ruling's conclusion that GAM II's plan "liquidat[es] GAM II's stay class equity interests in" the Fund is incorrect because "[s]tay class interest holders are [only] entitled to quarterly distributions from the Fund" once the Fund pays other claims and equity interests under the Fund's plan, and the Fund's operating agreement contains restrictions on transfers of membership interests. *Id*. at 4 (quoting ECF No. 566, at 8).

Fair enough. Let us not call GAM II's plan a liquidating plan. But let's be clear: it is not a plan that envisions GAM II reorganizing to engage in profitable future business operations. It is a plan that generally proposes to do two things: (1) pay all administrative expenses and claims owed by GAM II's estate and (2) pay all other funds to Hull to finance his chapter 11 plan. See ECF Nos. 427 & 428. The sole source of funding for GAM II's plan "will come from the GTIF [the Fund] Plan Payments" (ECF No. 427, at 9), i.e., "payments made under GTIF Chapter 11 Plan to GAM II" (ECF No. 428, at 4). GAM II's plan thus contemplates that GAM II exists solely to collect payments from the Fund, pay its expenses and claims, and then pay Hull's bankruptcy estate.

The debtors' joint disclosure statement and projections make clear, moreover, that the feasibility of their joint plan depends on GAM II committing double the current value of its equity interests (currently valued by GAM II at $4 million but projected by the debtors to double in value to $8 million) to fund GAM II's distributions under the proposed chapter 11 plan. As the joint disclosure statement explains:

> The cash to fund the Plan for GAM II will come from the [payments made under the Fund's chapter 11 plan to GAM II]. There are two types of plan payments. First, GAM II has an administrative expense against [the Fund]. . . . Additionally, GAM II has $700,000 and $3,300,000 Class A Equity Interests that are classified as stay interests. Payment on these only occurs after all "leave" interests have been paid the amount of their investment.

> . . .
>
> By the end of the second year after the Effective Date, Exhibit C project[s] that all "leave" interests in [the Fund] will be paid in full. Consequently, payments on GAM II's stay interests can begin. Exhibit C projects that 150% of $700,000 of GAM II's stay interests will be paid before the end of the second year. Then, it projects 150% of $3,300,000 of stay interests will be paid by the end of the third year and $1,000,000 in years 4 and 5.
>
> . . .
>
> Finally, after all GAM II creditors are paid in full, funds through five years after the Effective Date will be paid to the Hull estate to be distributed to his Creditors.

ECF No. 427, at 10-11 & 17. Whether or not GAM II officially dissolves as an entity, the feasibility of the joint proposed chapter 11 plan appears to effectively rely on a complete exhaustion of GAM II's equity interests. Only if GAM II's $4 million in equity interests in the Fund *more* than double in value during its five-year plan term will GAM II not have to exhaust its equity interests to fund its plan. And, regardless, the plan does not contemplate GAM II engaging in future business operations beyond collection of payments on claims and equity interests.

As a result, the evidence shows that GAM II lacks a reasonable possibility of reestablishing its business, which, as the March 18 ruling explained is the touchstone to determining whether section 1112(b)(4)(A)'s lack of reasonable likelihood of rehabilitation is met:

> "Rehabilitation," as used in section 1112(b)(4)(A), "refer[s] to the debtor's ability to restore the viability of its business." *Loop Corp.*, 379 F.3d at 516; see also *Andover Covered Bridge, LLC v. Harrington* (*In re Andover Covered Bridge, LLC*), 553 B.R. 162, 174-75 (B.A.P. 1st Cir. 2016) ("'Rehabilitation' in this context means whether the debtor will be able to reestablish its business".). And "[a]lthough the question of rehabilitation under section 1112(b)(4)(A) is not synonymous with reorganization (i.e., the debtor need not have a

confirmed reorganization plan in place to avoid conversion), the debtor still must have 'sufficient business prospects[]' to 'justify continuance of [a] reorganization effort'". *Hoover v. Harrington (In re Hoover)*, 828 F.3d 5, 10 (1st Cir. 2016) (first quoting *In re Landmark Atl. Hess Farm, LLC*, 448 B.R. 707, 714–15 (Bankr. D. Md. 2011), then quoting *In re LG Motors, Inc.*, 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009)).

ECF No. 566, at 8–9. GAM II's motion for reconsideration does not dispute these principles. And applying them to the uncontested facts requires the March 18 ruling's conclusion that GAM II lacks a reasonable likelihood of rehabilitation for purposes of section 1112(b)(4)(A), whether GAM II's plan is or is not properly cast as a liquidating plan.

3

What is more, even if the March 18 ruling's application of section 1112(b)(4)(A) were in error, there would be no reason to reconsider the March 18 ruling's conclusion that there is cause to dismiss or convert GAM II's chapter 11 case. The evidence presented, including judicially noticeable facts about the progress of the Fund's bankruptcy case and the SEC action, is sufficient to find cause to convert or dismiss that case under section 1112(b)(1).

Section 1112(b)(1) provides that "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." Section 1112(b)(4)'s non-exclusive list of circumstances amounting to cause does not limit the court's ability to find such cause in other instances. *Greene v. U.S. Bank, N.A. (In re Gannon Intern., Ltd.)*, 528 B.R. 906, 910 (E.D. Mo. 2015) (quoting *Loop Corp. v. U.S. Trustee*, 290 B.R. 108, 112 (Bankr. D. Minn. 2003) ("Section 1112(b)(4) of the Bankruptcy Code sets forth examples of cause justifying the dismissal of a Chapter 11 case. 11 U.S.C. § 1112(b)(4)(A)-(P). 'The list is not exhaustive

and court may find cause for other equitable reasons.'"). "The very purpose of §1112(b) is to cut short th[e] plan and confirmation process where it is pointless." *Matter of Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994).

The evidence shows that GAM II cannot fund, and thus cannot now confirm (at least as anything other than a liquidating plan, see 11 U.S.C. section 1129(a)(11)), its proposed plan that provides for full payment of its administrative expenses and certain required prepetition claims.[4] Again, GAM II has not received any significant income in the more than two and half years this case has been pending, though, as observed above, it has incurred administrative expenses of over $800 thousand through the end of 2023. GAM II does not have the current ability to pay any of those administrative expenses—as of April 30, 2024, it reported cash on hand of $108.90. ECF No. 621, at 2 & 5. GAM II's only ability to generate income is by receiving payments from the Fund; however, the Fund is unlikely to pay GAM II anytime soon. The Fund failed to achieve the asset sales it predicted during the confirmation hearing on its plan. The failure to achieve those sales led to the Fund's failure to make required payments under its reorganization plan, which, in turn, resulted in the termination of the Fund's former managers, including GAM II. For lack of revenue, the Fund has failed to make payments to creditors and investors who elected to have the Fund redeem their membership interests. Under its new manager, the Fund has asserted claims against GAM II—arising out of, among other things, the jury's findings, and anticipated remedies awards in the SEC action—that allegedly offset any liability the Fund may

---

4. Section 1129(a)(11) states, "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." This is provision requires the debtor (as plan proponent) to prove that it will have sufficient income to fund the payments required by the plan, unless the plan is a liquidating plan. The liquidating-plan exception does not aid GAM II, since, if its plan is understood as a liquidating plan, then it cannot show a reasonable likelihood of rehabilitation and, as discussed above, given its substantial and continuing administrative expenses, there is cause to convert or dismiss under section 1112(b)(4)(A).

have to GAM II, its former manager. Given these circumstances, there is no reasonable chance that GAM II will soon receive payments from the Fund in an amount sufficient to finance GAM II's chapter 11 plan.

Until GAM II receives payments from the Fund, it cannot fund its own chapter 11 plan, and the evidence shows that payments from the Fund are unlikely to commence anytime soon. Consequently, there is cause to convert or dismiss this case under section 1112(b)(1), and the debtor has not shown that there is a reasonable likelihood that it will confirm a plan in a reasonable time, as required to avoid conversion or dismissal under section 1112(b)(2).[5]

---

5. Section 1112(b)(2) states (quoting with some omissions of inapplicable provisions):

> The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of the creditors and the estate, and the debtor or any other party in interest establishes that–
>
> (A)  there is a reasonable likelihood that a plan will be confirmed within . . . a reasonable period of time; and
> (B)  the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)–
> (i)  for which there exists a reasonable justification for the act or omission; and
> (ii)  that will be cured within a reasonable period of time fixed by the court.

As section 1112(b)(2)'s text makes clear, this limitation on the conversion or dismissal is inapplicable when the court concludes there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation", as provided in paragraph (4)(A) of section 1112(b), and as found in the March 18 ruling and reaffirmed on reconsideration in this opinion. Additionally, section 1112(b)(2) does not prohibit conversion or dismissal on the alternative grounds for finding cause discussed in the text because, for the reasons discussed above, the debtor has not shown a reasonable likelihood that it will confirm a plan in a reasonable time. This case has been pending for over two and half years and there is no persuasive evidence that the Fund in the foreseeable future will begin making payments necessary for GAM II to fund a confirmable plan.

II

The finding of cause to convert or dismiss GAM II's case requires a choice between those options. That choice "is committed to the discretion of the bankruptcy court" and depends on which course is shown to be "in the best interests of creditors and the estate" under section 1112(b)(1). *Andover Covered Bridge, LLC*, 553 B.R. at 177. In making the determination, courts generally consider the likely outcomes for those with an interest in the bankruptcy estate and rule in the way that is expected to best serve those interests under the applicable circumstances.[6]

The United States trustee joins Hallick in requesting dismissal. GAM II requests conversion, arguing that the $1.4 million in administrative claim that the Fund owes it is a valuable asset and if GAM II's case is dismissed, then that asset will not be distributed to all creditors but will go only to creditor Erick Hallick.[7] GAM II argues that, "[i]n

---

6. As explained by the Bankruptcy Appellate Panel for the First Circuit, "courts have typically considered the following factors to determine whether dismissal or conversion is in the best interest" of creditors and the estate:

> (1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal, (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted, (3) whether the debtor would simply file a further case upon dismissal, (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors, (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise, (6) whether any remaining issues would be better resolved outside the bankruptcy forum, (7) whether the estate consists of a "single asset," (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests, (9) whether a plan has been confirmed and whether any property remains in the estate to be administered, and (10), whether the appointment of a trustee is desirable to supervise the estate and address possible environment and safety concerns.

*Andover Covered Bridge, LLC*, 553 B.R. at 177–78 (quoting *In re Costa Bonita Beach Resort, Inc.*, 513 B.R. 184, 200–01 (Bankr. D. P.R. 2014)). In making the decision here, the court has considered these factors to the extent they are or might be relevant. The most relevant factors applicable in this case are discussed in the text.

7. GAM II's argument presumes entry of an unconditioned dismissal, which would reinstate Hallick's levy order against GAM II—an order that GAM II as debtor in possession avoided as a preferential

contrast, a chapter 7 trustee could pursue GAM II's claim against the Fund for the benefit of the body of creditors, with the preferential transfer to Hallick avoided" and that would serve the best interests of the estate and creditors because conversion "would cause a larger number of creditors to be paid" and "[t]he amount of time required to collect from the Fund would presumably be similar whether the case is converted or dismissed." ECF No. 572, at 7. Persisting in its hope of payment from the Fund, GAM II suggests that the Fund is positioned to receive "considerable sums" from a long-anticipated sale of an entity in which the Fund holds an equity interest, and that "[w]hile this transaction has not yet come to full fruition, it should not be discounted completely as a possibility in the near future." ECF No. 572, at 8. Implicitly conceding the Fund's reluctance to pay its former managers anything, GAM II states that it "has prepared a state court action" that it intends to file against the Fund if the Fund acquires the financial wherewithal to pay GAM II. *Id.* Based on these facts, GAM II argues that "it should be left to the chapter 7 trustee to decide whether pursuit of GAM II's claims against the Fund is economically viable or feasible." *Id.*

Considering and weighing all the relevant circumstances, the court is persuaded that dismissal is in the best interests of creditors and the estate. As discussed above, the Fund is currently unable to honor its plan commitments and, if it were able, it has suggested that it won't pay GAM II because its new management views GAM II as an orchestrator of the events that led to the Fund's bankruptcy. All things considered, a GAM II chapter 7 estate's ability to recover from the Fund, especially in any reasonable

---

transfer for the benefit of the estate—making Hallick the sole beneficiary of the Fund's future payments to GAM II until his judgment is fully satisfied. See 11 U.S.C. §349(b)(1)(B). GAM II does not request that the court enter a conditional dismissal order in this case to preserve the avoidance of Hallick's levy order. GAM II instead states that it "reserves the right to argue that cause exists in this case to not reinstate Hallick's levy order." ECF No. 572, at 7 n.3. But the court afforded the parties an opportunity to address how it should proceed having found cause to convert or dismiss GAM II case. GAM II did not request (even in the alternative) that the court should condition any dismissal on the permanent avoidance of Hallick's liens or present an argument supporting that outcome. GAM II has thus forfeited any request that the court condition dismissal on the permanent avoidance of Hallick's liens.

timeframe, is speculative.

While the Fund is presumed to have valuable assets, and thus GAM II's claims against the Fund may have substantial value, GAM II has been unable to collect those amounts from the Fund during the two years following confirmation of the Fund's chapter 11 plan. And the ability to collect from the Fund depends on the Fund's ability to generate income or liquidate its assets. Annette Kaja, the individual serving as the Fund's current manager, testified at a January 2024 hearing; she "suggest[ed] that the Fund is unlikely to have sufficient liquid funds to make those payments [including to GAM II] anytime soon." ECF No. 566, at 10. She also testified that she did not know when the Fund would be able to make the payments required under its confirmed chapter 11 plan, and that "she could not predict when the Fund might receive cash from a long-anticipated sale of an entity in which the Fund holds an equity interest, instead stating that she lacked a basis from which to conclude that a sale of that entity or the Fund's interest in it would occur anytime soon." *Id.*

And, as already discussed, the Fund has made it clear that it intends to defend against GAM II's requests for payment by asserting claims it maintains nullify or limit its obligations to pay its former managers. Given the course of events, including the jury's findings of misrepresentations by the Fund's former managers, if the Fund becomes more liquid, one reasonably expects that its new management will prefer to meet other commitments—including paying its members who chose to have the Fund redeem their interests under the terms of the Fund's reorganization plan—rather than pay its former managers, even if that requires financing litigation efforts against those former managers.

No evidence has been presented from which the court can find it likely that a chapter 7 trustee could retain counsel to litigate these issues against the Fund, even on a contingency basis, and, under the circumstances, the court cannot reasonably determine that the estate would be able to shoulder the administrative costs of pursuing GAM II's

claims and equity interests. The costs of future litigation necessary for GAM II to collect on its claims appear to be substantial, and GAM II has no liquid assets that a chapter 7 trustee could use to undertake that litigation, making it difficult to engage professionals, including counsel, to act on behalf of the bankruptcy estate.

A chapter 7 trustee's path to potential payment from the Fund is likely to be long and costly, especially now that the Fund is under new management, and the Fund's lack of liquid assets, combined with the GAM II estate's lack of funds, makes administering GAM II's estate in chapter 7 impractical. For all these reasons, the court concludes that dismissal is the course that best serves the interests of creditors and the estate.

III

For the reasons stated above, it is ORDERED:

1. Greenpoint Asset Management II, LLC's motion to reconsider the March 18, 2024 order is denied.

2. Greenpoint Asset Management II, LLC's case is dismissed effective as of the date of the entry of this opinion and order. Because Greenpoint Asset Management II, LLC's case is being dismissed, joint administration of *In re Greenpoint Asset Management II, LLC*, Case No. 21-25900, and *In re Michael G. Hull*, Case No. 21-25901, is terminated effective upon entry of this order. The official caption for use in each case is the ordinary caption for a single debtor. See, e.g., Official Form 416A & B.

# # # # #